# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DAMEION PERKINS,

                Plaintiff,

v.

COUNTY OF MILWAUKEE,
SLYVANA RADMER, and SANDRA
KELLNER,

                Defendants.

Case No. 18-CV-179-JPS

**ORDER**

## 1. INTRODUCTION

Plaintiff is the brother of Dontre Hamilton ("Hamilton"), who was killed by a Milwaukee police officer in April 2014. (Docket #1 at 3). Plaintiff participated in protests following Hamilton's death and made public statements critical of the City of Milwaukee. *Id.* He later applied for employment with Defendant Milwaukee County (the "County"). *Id.* Plaintiff says his application was denied because of his association with Hamilton and his public statements. *Id.* at 6. Plaintiff alleges that Defendants' refusal to hire him violated his rights of free speech, association, and equal protection. *Id.* Defendants deny Plaintiff's accusations and filed a motion for summary judgment on September 14, 2018. (Docket #24). The motion is now fully briefed, and for the reasons explained below, it will be granted.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 ("FRCP") provides that the "court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The non-movant "need not match the movant witness for witness, nor persuade the court that [their] case is convincing, [they] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3.  **BACKGROUND**

    3.1  **Plaintiff's Failure to Dispute Defendants' Proposed Findings of Fact**

Preliminarily, the Court must note that Plaintiff, through conscious disregard of the rules of procedure, has admitted most of the facts material to Defendants' motion. In his response to Defendants' proposed findings of fact, Plaintiff attempts to deny certain facts and qualify his admission of others. *See, e.g.*, (Docket #36 ¶¶ 9, 10). In almost every instance, however, these did not take the form of a prose response to the asserted fact. Instead, Plaintiff merely states "DENY" or "ADMIT," immediately followed by a citation to his own proposed findings of fact. *Id.* In some places Plaintiff string-cites to *dozens* of his proposed facts to support a denial or qualified

admission. *See, e.g., id.* ¶ 40. For one particularly important denial, Plaintiff cites to literally every one of his own ninety-four statements of fact. *Id.* ¶ 60. Out of his responses to Defendants' sixty proposed findings of fact, in only two does Plaintiff offer the barest explanation as to the basis for his dispute or qualified admission. *Id.* ¶¶ 28, 47. Most importantly, however, nowhere in the entire response document does Plaintiff actually cite to evidentiary materials. *See generally id.*

Plaintiff's approach flies in the face of straightforward rules of summary judgment procedure. FRCP 56 states that a party "must" support a putative dispute of fact by citing to evidence or by showing that the materials the movant cited do not establish the fact at issue. Fed. R. Civ. P. 56(c)(1)(A)–(B). Civil Local Rule 56 similarly requires a party opposing a summary judgment motion to supply a "concise response to the moving party's statement of facts" that must include "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon[.]" Civ. L. R. 56(b)(2)(B)(i). It is clear that Plaintiff knows how to follow these rules, as he did so in his own proposed findings of fact. *See* (Docket #35). Why Plaintiff chose to flaunt the rules in responding to Defendants' proposed facts is not only beyond the Court's understanding, but also inexplicable.

As explained in *Waldridge*, in assessing a summary judgment motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. . . . The parties, in turn, bear a concomitant burden to identify the evidence that will facilitate this assessment." *Waldridge*, 24 F.3d at 920 (citations omitted). The court held that requiring compliance with the federal and local rules of procedure

> benefit[s] the parties themselves by requiring their opponents to clarify exactly what they dispute and on what evidence they rely. . . . But they are of significantly greater benefit to the court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information.

*Id.* at 923–24 (citation omitted); *Hamm v. Nestle USA, Inc.*, No. 12-CV-2427, 2013 WL 4401328, at *1 (N.D. Ill. Aug. 15, 2013) (attempting to dispute a fact without citing evidence, but instead only referencing a party's own proposed fact statements, is improper). Indeed, even *pro se* litigants are required to follow these procedural rules. *Smith v. Lamz*, 321 F.3d 680, 682–83 (7th Cir. 2003).

Plaintiff's response to Defendants' statement of facts must, therefore, be viewed as willful noncompliance. In other words, Plaintiff knows full well that he must explain why a fact is disputed and then support that explanation by citation to evidentiary materials. Instead, Plaintiff has attempted to foist his obligation onto the Court, requiring the Court to embark on an archeological dig through his own findings of fact to piece together the theory of his dispute(s) and that which supports it. This, the Court will not do. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008) (district courts are entitled to expect strict compliance with the rules of summary judgment procedure, and do not abuse their discretion in disregarding improperly presented disputes of fact); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Thus, for the purpose of deciding this motion, the Court will take Defendants' statements of fact as true. Fed. R. Civ. P. 56(e)(2). Plaintiff's proposed findings of fact will be considered only to the

extent that they are admitted by Defendants, do not otherwise contradict Defendants' now-conceded facts, and are relevant.

**3.2     Relevant Facts**

Defendants Sylvana Radmer ("Radmer") and Sandra Kellner ("Kellner") were, during the relevant period, employees of Milwaukee Transport Services, Inc. ("MTS"). Radmer was MTS's Director of Human Resources and Kellner was the Chief Administrative Officer. Radmer reports to Kellner, who then reports to MTS's Deputy Director, Mark Stein ("Stein"). Stein, in turn, reports to MTS's Managing Director Dan Boehm ("Boehm"). Finally, Boehm reports to the Milwaukee County Department of Transportation.

MTS is a privately-owned company contracted to work for the Milwaukee County Transit System ("MCTS"), which is a public entity. The County acquired MCTS in 1975, and then contracted with MTS to actually operate MCTS's services. The County does not itself have any role in human resources decisions for MTS's union employees.

Sandra Goins-Jones ("Goins-Jones") was MTS's Talent Acquisition and Development Manager. Rodney McCreight ("McCreight") was a contractor who served MTS as a Talent Acquisition Recruiter. McCreight's job was to handle recruitment of bus drivers and related staff, including reviewing resumes, conducting phone screenings, inviting selected applicants for interviews, and extending job offers. Goins-Jones was McCreight's direct supervisor.

On December 13, 2016, Plaintiff applied for a bus driver position with MTS, though he was actually more interested in a Cleaner/Tanker position, of which there were multiple openings at the time. Plaintiff spoke with James Macon ("Macon"), president of the MTS employee union, about

employment with MTS before applying. Of course, Macon did not himself have any authority in hiring decisions on behalf of MTS. Nevertheless, Goins-Jones received a number of calls from Macon, who stated that Plaintiff would be a good candidate for the Cleaner/Tanker position.

About that time, Goins-Jones asked McCreight to conduct phone screenings for Cleaner/Tanker applicants. Plaintiff was included in the group to be screened. Screening serves to help McCreight understand the applicant's work experience, their interest in the position, and their communication skills and demeanor. If an applicant has a successful phone screening, they will be asked to do an in-person interview.

On December 19, 2016, Plaintiff participated in a phone screening with McCreight. Plaintiff was asked a standard series of questions, and McCreight made note of his answers. When asked why he wanted the job, Plaintiff said he wanted to make more money and work at a place where he could advance. Plaintiff did not mention any particular interest in the Cleaner/Tanker position or MTS generally. In response to a question about prior employment in a team setting, Plaintiff said he had previously worked in a team environment, but provided no details about that experience. During the interview, Plaintiff also revealed that he was Hamilton's brother.

Though Plaintiff met the minimum qualifications for a Cleaner/Tanker position, McCreight decided that Plaintiff should not move forward in the recruitment process. McCreight perceived that Plaintiff had a negative attitude toward his prior employer and feared that Plaintiff

would bring that attitude to his work at MTS.[1] McCreight did not find Plaintiff's relation to Hamilton relevant and did not consider it in making his decision. At the time he made the decision, McCreight was also not aware of Plaintiff's civil rights advocacy or any of his public statements. Defendants maintain that McCreight's decision to reject Plaintiff's application was his alone and was within his authority as a Talent Recruiter. The open Cleaner/Tanker positions were eventually filled by other candidates.

After making his decision, McCreight discussed the outcome of his phone screenings with Goins-Jones. Among other things, McCreight told her that Plaintiff was Hamilton's brother. Goins-Jones took Plaintiff's file from McCreight to review it herself. She also offered a "joke" that she would not hire someone whose family had blocked traffic. She says it was based on the fact that "we're a transportation company and Mr. Perkins' family, they stop transportation." (Docket #30-4 at 70:13-23). Later in December, Goins-Jones mentioned Plaintiff and retold her "joke" to Radmer. Radmer responded that this was not a legitimate reason to disqualify a candidate.

In early January 2017, Goins-Jones again repeated her "joke," this time to Macon. Goins-Jones claims that both understood her statement to be a joke and that Macon laughed. However, other MTS employees who heard the statement did not think it humorous and did not see Macon

---

[1] McCreight's contemporaneous notes state: "Candidate had a very negative attitude towards current position at Sprint. Seemed very bitter towards current employer. Would not recommend further steps in process due to the way he talked about current employer." (Docket #29-1 at 3).

laugh. Plaintiff also states that when Macon informed him of the encounter, Macon did not express a belief that the statement was a joke.

In the second week of January 2017, Radmer was told by various people about Goins-Jones' "joke" to Macon. At the end of the week, Goins-Jones told Radmer that Plaintiff was calling her repeatedly about the status of his application. Radmer recommended that Goins-Jones send Plaintiff a standard rejection letter. Additionally, at some point, Macon himself confronted Radmer about Goins-Jones' statement. She agreed that it was not a good reason to refuse to hire Plaintiff, but emphasized that it was not the reason Plaintiff's application was rejected.

The next Monday, January 16, 2017, Plaintiff called Radmer directly to complain that he was being denied consideration for the job because of his family. Radmer informed Kellner of Plaintiff's concern, and they agreed to invite him to an in-person meeting. Prior to the meeting, Radmer reviewed Plaintiff's application materials and McCreight's notes. Plaintiff met with Radmer and Kellner that same day. The purpose of the meeting was to investigate Goins-Jones' comment and Plaintiff's concerns about it, not to interview him for the job. Nevertheless, during the meeting, they did not notice a difference in Plaintiff's attitude or demeanor from what McCreight had observed. Radmer and Kellner told Plaintiff his application was rejected because of the unfavorable phone screening, not his family affiliation. Radmer and Kellner then met with McCreight to confirm that Plaintiff's family ties played no role in his decision to remove Plaintiff from consideration for the job.

Radmer's investigation of Goins-Jones' comment continued. She asked the MTS employees who had been present with Macon to prepare memoranda recounting what they had heard. On January 17, 2017, Radmer

and Kellner met with Goins-Jones about the comment. Goins-Jones was adamant that it was a joke. Radmer and Kellner offered the memoranda as proof that it was not taken that way. They then reprimanded her for making the "joke" and thus giving an inaccurate account of why Plaintiff was not hired. After the meeting, Goins-Jones went to McCreight and said she intended to hire Plaintiff. McCreight immediately informed Radmer of this. The next day, Radmer and Kellner again met with Goins-Jones. They reiterated that Plaintiff would not be hired because he did not pass the initial phone screening.

Radmer and Kellner stress that they did not refuse to hire Plaintiff because of his civil rights advocacy or his public statements. Indeed, while they had heard of Hamilton, they had no particular knowledge of Plaintiff's activities. Goins-Jones was the only person who had made a comment that Plaintiff would not be hired because of his family affiliation. Though Plaintiff presents a First Amendment claim, he had not identified any specific dates on which he engaged in protected speech or the content of specific statements. Instead, he claims to have made statements on television about "getting justice for [his] brother," the "[d]ates and times, if you type my name in Google, you will find[.]" (Docket #40 ¶¶ 51–52). According to Plaintiff, the only support for his retaliation claim is Goins-Jones' "joke."

4.   **ANALYSIS**

Plaintiff's equal protection claim was dismissed with his consent on April 4, 2018. (Docket #18). Defendants' opening brief argues that Plaintiff's freedom of association claim is, at best, coterminous with his freedom of speech claim. (Docket #32 at 20). Plaintiff did not respond to that argument or make any separate attempt to defend his freedom of association claim.

*See generally* (Docket #38). The Court will, therefore, confine its analysis to the only remaining disputed claim—retaliation for the exercise of Plaintiff's right of free speech.

"Government retaliation tends to chill an individual's exercise of his First Amendment rights," the Seventh Circuit observes, "and this principle applies with equal force in the context of public-sector employment." *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Thus, government employers "may not respond to their employees' protected activity with actions aimed to deter that activity." *Id.* Though Plaintiff only vaguely alleges that Defendants violated his First Amendment rights, (Docket #1 at 6), his claim must be one for retaliation; his allegedly protected speech occurred long before he applied to the position at issue here. To make a *prima facie* case for First Amendment retaliation, Plaintiff must establish that "(1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter speech, and (3) his speech was at least a motivating factor in the employer's action." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013).[2]

There are fatal problems with each aspect of Plaintiff's retaliation claim. Preliminarily, his claim against the County is misplaced. MTS is a private company which has contracted with the County to provide

---

[2]There are other showings required to ultimately prove the claim. Once Plaintiff makes his *prima facie* case, the burden of proof shifts to Defendants "to demonstrate that [they] would have taken the same action in the absence of the protected speech." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009). If Defendants carry this burden, Plaintiff must then show that Defendants' reasons for taking the employment action are mere pretext. *Id.* Because Plaintiff comes nowhere close to making his *prima facie* case, the Court does not delve into these issues (which the parties did not brief, in any event).

transportation services. The County itself has no role in human resources decisions regarding MTS employees. Radmer and Kellner are employees of MTS, and Plaintiff's application for employment was with MTS, not the County. Thus, the County is not a proper defendant in this matter.[3] This begs the question: though it is a private company, does MTS's quasi-government status—its connection with the County and its provision of a public transport service—qualify MTS as a public employer, such that First Amendment liability may attach? Though the answer to this question would be dispositive of the case, the parties have not briefed it. The Court will assume, without deciding, that MTS should be considered a public employer defendant.

Even with this assumption, Plaintiff's problems do not end. Local government entities cannot be held vicariously liable for constitutional violations committed by their employees, which is precisely what Plaintiff alleges here. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Such entities can, nevertheless, be liable under Section 1983 if "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook*

---

[3] Plaintiff cites two opinions of the Wisconsin Court of Appeals, and one of the Seventh Circuit, for the proposition that the County can be held liable in lawsuits involving MTS. Not only have Plaintiff's procedural failings rendered the fact undisputed in Defendants' favor, the Court quite agrees with Defendants' analysis in their reply, (Docket #39 at 4–6), that the cases are neither controlling nor persuasive on what MTS's status actually is vis-à-vis the County, or whether the County may be liable in *this* case.

*Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690). These are colloquially referred to as "*Monell*" claims.

Plaintiff offers his *Monell* claim pursuant to the third theory. He argues that Radmer and Kellner were "final policymakers" for MTS. (Docket #38 at 7). More precisely, Plaintiff emphasizes that the parties dispute who made the final decision not to hire Plaintiff, whether it was McCreight, Goins-Jones, Radmer, or Kellner. He laboriously reviews the evidence as to each person's involvement in Plaintiff's application. *Id.* at 7–27.

Plaintiff completely misunderstands what a "final policymaker" is for purposes of *Monell* liability, which is a question of law to be decided by the Court. *Valentino*, 575 F.3d at 675–76.[4] *Valentino*, decided more than a decade ago, is directly on-point. Mayor Owen of the Village of South Chicago Heights (the "Village") hired family members, friends, and campaign contributors to fill various municipal government positions. *Id.* at 669. Valentino, a secretary for the Village, discovered that some of these people were being paid for hours they did not work. *Id.* at 669–70. She disclosed this to her former supervisor who had previously quit because of conflicts with Owen. *Id.* The former supervisor then made a series of Freedom of Information Act requests seeking documents to expose the scheme. *Id.* Valentino herself began surreptitiously copying sign-in sheets to prove her suspicions. *Id.* Owen found out that Valentino had spilled the beans and had Village Administrator Petersen search her desk. *Id.* at 670.

---

[4]This is unsurprising, as Plaintiff's brief makes no attempt to cite or analogize to any case law specifically addressing the "final policymaker" issue, but is instead largely a stream-of-consciousness discussion of evidentiary material.

Petersen discovered the copied sign-in sheets. *Id.* Valentino was immediately fired, ostensibly for the unlawful copying. *Id.*

Valentino sued Owen, Petersen, and the Village for First Amendment retaliation. *Id.* The trial court granted summary judgment to the defendants. *Id.* The appellate court determined that Valentino had raised triable issues of fact on her retaliation claim. *Id.* at 670–74. It then turned to the Village's *Monell* liability:

> Valentino contends that because Owen made the ultimate decision to fire her, *Monell* liability should apply. But just because Owen is the decisionmaker on hiring/firing decisions for the Village government does not necessarily make him the policymaker on those issues. "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." [*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986)]. Rather, such an official also must be responsible for establishing final government policy on a particular issue. The determination of whether a person has policymaking authority is a question of state law, and is to be decided by the court. Our inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker in a particular area, or on a particular issue; here, the relevant question is whether Mayor Owen is a policy-maker on personnel decisions.
> . . .
> Helpful in determining whether an official is a final decisionmaker is an inquiry into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority. Also helpful is an examination of not only positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law.

> It is clear that Mayor Owen is a decisionmaker with regards to personnel decisions within the Village. He has placed at least five of his family members and several friends on the Village payroll. Owen, admittedly, had the final say-so regarding the termination of Valentino. Moreover, several Village ordinances indicate that Mayor Owen makes personnel decisions regarding Village employees.
>
> . . .
>
> However, just because Owen makes personnel decisions does not necessarily mean that he is the final decisionmaker on such matters such that he can be considered a policymaker for the Village in this area. It is a "well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority. There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire." [*Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 739 (7th Cir. 1993).] The Village argues that the Board of Trustees, and not Owen, is the final decisionmaker because it says the Board sets personnel policy and reviews termination decisions, whereas Owen merely has discretion to carry out the policy set by the Board.

*Id.* at 675–77 (citations and quotations omitted). The court rejected the Village's argument, concluding that

> Defendants cannot point to any edicts from the board of trustees that in any way govern the manner in which Mayor Owen may make his hiring or firing decisions. Nor do they point to any instances in which the board provided any meaningful oversight of Mayor Owen's decisionmaking process or meaningfully reviewed his termination decisions. Instead, all the evidence indicates that Mayor Owen, either personally or by his own delegation, makes the personnel decisions for his office. Therefore, it is clear to us that Mayor Owen is the *de facto* policymaker for the Village with regard to personnel decisions in his office.

*Id.* at 678; *see also Rasche v. Vill. of Beecher*, 336 F.3d 588, 599–601 ("In order to have final policymaking authority, an official must possess [r]esponsibility for making law or setting policy, that is, authority to adopt rules for the conduct of government.") (quotation omitted).

Summary judgment is "the put up or shut up moment in a lawsuit." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). Assuming that Radmer and Kellner did indeed make the final decision on Plaintiff's application, he bears the burden to further establish that, as a matter of law, they were final policymakers for MTS. If Plaintiff cannot do so now, he is not entitled to go to a jury with his *Monell* theory.

Plaintiff has utterly failed to carry his burden. Plaintiff's brief makes no attempt to engage with the analysis or elements of proof raised in *Valentino*. He has not provided the relevant evidence, in any event. Plaintiff has no evidence demonstrating that Radmer and Kellner's decisionmaking was, like Owen's, either legally or practically unconstrained by higher supervisors or policymakers. Instead, it appears that they merely exercised hiring discretion granted to them within the confines of MTS personnel policy. Moreover, Radmer reported to Kellner, who reported to Stein, who reported to Boehm, who reported to the Milwaukee County Department of Transportation. Where did final policymaking authority lie? Plaintiff does not say.

Ultimately, Plaintiff has not established that Radmer or Kellner themselves set personnel policy, which is the only viable path to *Monell* liability. The Court is unable to construct an appropriate argument or marshal evidence on his behalf. *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1335 (7th Cir. 1995). Thus, despite all of Plaintiff's bluster on the point, it does not matter who made the final decision as to whether he should be

hired. The relevant question—who was the final policymaker—he has left unanswered.

Plaintiff's argument as to Radmer and Kellner's individual liability is confused at best. He does not actually assess their conduct as against the elements of a retaliation claim. (Docket #38 at 18–27). Instead, he frames his position within the confines of his *Monell* theory, and the thrust of his argument is that they were final decisionmakers. *Id.* Generously reading an argument in favor of individual liability into Plaintiff's brief, he has nevertheless failed to make his *prima facie* case. Recall that the elements of a retaliation claim are an instance of protected speech, a negative employment action which would deter further speech, and proof that the speech motivated the employer's action. *Swetlik*, 738 F.3d at 825; *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008).

As to the first element, Plaintiff curiously refuses to identify any specific instance of allegedly protected speech. Rather, in both his deposition and in his legal brief, Plaintiff vaguely gestures at instances of speech "too numerous to cite" and which may be found by "[a] cursory Google search." *Id.* at 6. Again, Plaintiff cannot later get to a jury without now providing the evidence which creates a triable issue of fact. Surely, if this case were tried, he would not tell the jurors to "Google" the instances of his protected speech. To ask the Court to do so at this stage is the height of absurdity. Without direct evidence of occasions of protected speech, the Court has no choice but to conclude that summary judgment is appropriate on the first element.

Assuming that being denied employment would deter free speech, Plaintiff also fails to establish the third element. Defendants insist that McCreight's decision to reject Plaintiff's application was final and was not

subject to review by Goins-Jones, Radmer, or Kellner. Plaintiff counters that his decision was merely a recommendation which needed to be ratified by a superior. The issue is irrelevant for two reasons. First, on the now undisputed facts, McCreight made the hiring decision, not Radmer or Kellner. Second, assuming Radmer and Kellner even implicitly ratified McCreight's decision, there is no evidence that they did so based on Plaintiff's alleged protected speech. Rather, it is undisputed that McCreight made his decision based on Plaintiff's attitude during the phone screen, and that none of McCreight, Radmer, or Kellner considered Plaintiff's activism in addressing his application. Plaintiff further admits that the entire basis of his retaliation claim is Goins-Jones' "joke," but she is not a defendant in this case.[5] Indeed, Radmer and Kellner not only refused to agree with Goins-Jones' statement, they condemned it. Plaintiff has not shown that his speech was a motivating factor in the decision not to hire him.

5. **CONCLUSION**

It is most regrettable that so much time and effort were put into this case only to be wasted by Plaintiff's conscious refusal to follow proper summary judgment procedure. His choice means that the material facts are undisputed. On those facts, Defendants are unquestionably entitled to summary judgment. The Court will, therefore, grant their motion and dismiss this action with prejudice.[6]

---

[5]This damning admission is the one the Court alluded to earlier, which Plaintiff attempted to dispute by referencing *all* of his ninety-four statements of fact. (Docket #36 ¶ 60).

[6]On November 13, 2018, Plaintiff filed a motion for sanctions pursuant to FRCP 11. (Docket #41). He contends that Defendants offered two frivolous arguments: 1) that MTS and the County should be considered separate entities, and 2) that Radmer and Kellner were not personally involved in the hiring

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for sanctions (Docket #41) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Docket #24) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's claims for violation of his rights of free speech and free association asserted under the First Amendment (Docket #1 at 6) be and the same are hereby **DISMISSED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of November, 2018.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge

---

decision. *Id.* In light of the foregoing, the motion must be denied. Defendants' arguments are far from frivolous; in fact, they are correct on both fronts. It is Plaintiff himself who is fortunate to escape sanction for his conduct in addressing the summary judgment motion.